## ALFRED HJERONYMUS v. THE STATE.

### No. 2878.   Decided March 9, 1904.

**1.—Murder—Charge of Court—Self-Defense.**

Where the evidence showed that defendant and his wife had separated, the latter going to her mother, taking with her their child, and that while defendant called there for his child a difficulty arose about the possession of the child in which the defendant's mother-in-law was killed and his brother-in-law wounded by defendant, and there was a conflict of testimony as to whether defendant acted in self-defense, the court should have charged fully upon that phase of the case, as well as apprehension of apparent danger.

**2.—Same—Perfect Right of Self-Defense.**

The court should have charged the jury, where the evidence showed that defendant sought to see his child at his mother-in-law's house, where defendant's wife had gone with the child, that he had a lawful right to do so, and that if while defendant was peaceably carrying out his purpose, he was assaulted by his brother-in-law, defendant's right of self-defense would be perfect.

**3.—Same.**

The court erred in his charge when he informed the jury that defendant would not be justified in provoking a difficulty and shooting two certain persons "or any other person," when there was no evidence that he had shot any other person.

**4.—Same—Intent to Provoke Difficulty.**

The court erred in charging the jury that an intent, on the part of defendant to provoke a difficulty in going to his mother-in-law's house deprived defendant of the right of self-defense, instead of informing the jury that defendant must do some act to provoke the difficulty before his right of self-defense is forfeited.

**5.—Manslaughter.**

See opinion for facts which do not raise the issue of manslaughter.

Appeal from the Criminal District Court of Galveston.   Tried below before Hon. J. K. P. Gillaspie.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Marsene Johnson* and *Aubrey Fuller*, for appellant.—We submit that, as has been shown by the record, the testimony warranted the court in giving both the first and third as well as the second requested special charges, and that the failure of the court to give same was error prejudicial to the substantial rights of defendant; that the court failed to charge upon these phases of the case as established by defendant's testimony; and that the court should have properly instructed the jury as to all phases of the case, and upon all issues raised.   Hall v. State, 60 S. W. Rep., 769; Tollett v. State, 55 S. W. Rep., 573; Hall v. State, 66 S. W. Rep., 783; State v. Evans (Mo.), 31 S. W. Rep., 34; Greta v. State, 9 Texas Crim. App., 429; Lott v. State, 17 Texas Crim. App., 598; White v. State, 18 Texas Crim. App., 57; Irvine v. State, 20 Texas Crim. App., 12; Parker v. State, 34 S. W. Rep., 265; Jackson v. State, 32 Texas Crim. Rep., 192.

The court erred in faling to instruct the jury substantially that

defendant had a lawful right to enter upon the premises of deceased to see his child; and that if while there a difficulty was provoked by deceased or by the wife of defendant or by John Cranston, but without intent on the part of either of said parties to slay or to injure defendant, and defendant used more force than was necessary to prevent a difficulty or to repel or to prevent an assault upon him by either of said parties, then and in that event defendant would be guilty of the offense of manslaughter; and to define manslaughter; and the court's said failure and refusal to so charge is assigned as error.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years.

Appellant and his wife separated, his wife returning to live with her mother, Mrs. Delia Cranston—appellant retaining their little girl in his possession. On the evening of the homicide appellant returned and found his child gone, and after some search decided to go to his mother-in-law's, to see if his wife had taken his child there. When he arrived he was informed by his mother-in-law that his wife had not returned. He left and in a short while afterwards returned and found his wife present, as well as his brother-in-law John Cranston. John Cranston testified to the facts leading up to the homicide, as follows: "Defendant came to the house the last time about 8:30 or 9 o'clock; walked up to the door, and my mother, sister and I were there. He asked for the child. My sister told him he could not have the child, unless the court gave it to him. Then he asked to take the child in his arms; and I said 'Give it to him if he will promise not to harm it; let him have it to hold.' But he would not promise. He said, 'No, I will make no promises,' and he made a break to get in the door. (My mother was standing right there by my side.) And he spoke about the way he was treated; and he caught hold of his coat, and threw it open, and says, 'Johnny, if you have a gun kill me; I have come to get that child.' I told him, 'I have no gun; go away.' In the meantime my sister hallooed for the police wagon; and he was walking up and down the gallery, and walked right up to my mother, who was right under my shoulder, and he pulled out a gun from his hip pocket, and put the gun to my mother's breast, and shot my mother; and my mother screamed, 'I am shot, Johnny; I am shot.' And I grabbed her by the arm and shoved my mother in the room. My gun was on the folding bed on the opposite side of the room, and as I reached up, he shot me in the shoulder; and I turned around and fired what I supposed was all the loads in the gun. I didn't know for certain. And at that he walked up and struck me with the gun three times, and split my face open, and I had to have stitches put in.

Then I grabbed for him, and he broke and run for the door, and I fired my last shot as he was fleeing." From the effects of this wound Mrs. Delia Cranston died. This is the substance of the State's evidence.

Appellant testified for himself as to the immediate difficulty, substantially as follows: That he went to his mother-in-law's house, Mrs. Cranston; when he got in sight his little brother-in-law Jimmie Cranston was standing on the gallery waiting. "As soon as he saw me he ran in the house. Then my brother-in-law, John Cranston and my wife came and locked the door. I walked up to the gate, upon the gallery, and asked my wife if she had the child there. She said yes. I asked her to let me have the child, and she said 'No, you can't have it any more; you can't even have it in your arms.' I replied, 'Why do you talk that way?' She said, 'Well you can't have it any more.' I replied, 'I have as much right to the child as you have.' After pleading with her about the child awhile, she stepped towards the door, and I was pushed by them back on the gallery, and for a few minutes I struggled there, and they pushed me back again. And then I walked up and down on the gallery, and my wife hallooed to a neighbor for the police. So I determined that I would wait for the police. Quite a crowd collected there, which they requested to leave. After this I walked up and down on the gallery for ten or fifteen minutes, maybe twenty minutes, pleading with them to let me have my baby. All the time my wife refused, and I pleaded with her. After awhile John Cranston said, 'Don't let him have the child.' I said, 'Johnny, this is none of your business.' I made a step towards the door, and at the same time he put his gun over my wife's shoulder and fired on me; at the same time I threw up my left hand and received the shot through my hand; then I pulled my gun and fired straight ahead of me two or three shots. At the time I fired the first shot, I left my mother-in-law behind me, and I didn't know anything more about my mother-in-law. Then I received a shot right in front of my eyes, which stunned me and knocked me to my knees, and while dropped to my knees somebody passed me, and either hit or kicked me with such force as to knock me flat. When I straightened up, I put my gun around against his breast—against his body—but did not fire; he was standing stooped down over my head. I got from under him; got to the door of the front room, and fished around the room to see if I could locate my child. While in there my wife and mother-in-law were running around the room screaming." He then left the house.

Exception is reserved because the court refused the following special instructions: "If you believe from the evidence that defendant went to the home of prosecuting witness, John Cranston, at the instance and request of his wife, or if you should find or believe from the evidence that defendant went to the home of said John Cranston to see his, defendant's child, or for any other lawful purpose, with or without invitation from

any one, and the said John Cranston made an unlawful and violent assault upon defendant with a pistol, and it reasonably appeared to defendant that said John Cranston was about to take his life or inflict serious bodily injury upon him, and defendant shot at said John Cranston, with a pistol, in order to save his own life, or to prevent serious bodily injury to himself from such unlawful assault, so made upon him, then you will find defendant not guilty, regardless of whether or not the shot or shots fired by defendant, if you believe he fired a shot or shots, struck or wounded Delia Cranston. And in this connection you are further instructed that, if defendant once commenced .to shoot, in order to save his life, or to prevent serious bodily injury to himself, then he would have the right to continue to shoot as long as there was an appearance of danger to himself from such threatened assault; and in determining whether or not the defendant was in danger from such an assault, you are instructed that it is not essential to the right of self-defense that the danger should in fact exist. The danger may be only apparent, and not real. If it reasonably appears from the circumstances of the case that danger existed, the person threatened with such apparent danger has the right to defend himself against it, and to the same extent that he would have were the danger real. And in determining whether there was reason to believe that danger did exist, the appearances must be viewed from the standpoint of defendant, who acted upon them, and from no other standpoint. If it reasonably appeared to defendant that the danger in facts existed, he had the right to defend against it, to the same extent and under the same rules as if the danger had been real."

And also exception was reserved to the refusal of the third special instruction requested by appellant, as follows: "If you find from the evidence that defendant was married to the sister of complaining witness, John Cranston, and that. defendant had a child by said wife, you are instructed that during the conjugal relations between defendant and his said wife before a decree of divorce has been granted, and before a court of competent jurisdiction has passed upon the question of the custody of the children, the husband has as much legal right to the care, custody and control of them as his wife; the wife and her relatives, or her relatives have no legal right to prevent the husband from seeing the children. Their legal rights are coequal. Defendant had the right to peaceably enter the premises of the complaining witness John Cranston, if you believe from the evidence that defendant's child was on said premises. He had the right in a peaceable manner to seek admission there for the purpose of carrying out the lawful purpose of seeking his child; if you believe that this was all that he did, and his brother-in-law John Cranston assaulted him with a pistol, his right of self-defense would be perfect. And you are further instructed that defendant could not be deprived of his legal right to see his child, whether he had been

invited by his wife to come to the place where the child was or not, or whether he had been forbidden by his father-in-law to come to said place or not."

These two special charges above quoted should have been given by the court in charge to the jury.

Appellant complains of the following portion of the charge of the court: "If the defendant was present at the time and place of the shooting and killing of the said Delia Cranston, if you find she was killed as alleged, and did by shooting the said Delia Cranston with a pistol kill her, and it reasonably appeared to him that his life was endangered, or he was in danger of serious bodily injury by being assaulted and shot by said Cranston, and you are to judge the defendant from his standpoint as it reasonably appeared to him and judged by all the facts and circumstances in evidence, and it would make no difference if the danger was real or not if it so appeared to him, nor would he be compelled to retreat to avoid slaying his antagonist, nor would he be bound to retreat, and the defendant would have the right to act so long as the danger was to him apparent, but he would not have the right to go to the home of said Delia Cranston or the place of said shooting to provoke a difficulty, and then and there shoot John Cranston or Delia Cranston, or any other person, if you should so find." This charge is erroneous in that portion of it wherein the court tells the jury that defendant would not have the right to go to the home of said Delia Cranston at the place of said shooting, to provoke a difficulty, and then and there shoot John Cranston, Delia Cranston, or any other person. In the first place, there was no evidence that he shot any person except Delia Cranston and John Cranston; and second, the intent with which appellant went there has nothing to do with his right of self-defense. He must do some act calculated to provoke the difficulty after going there before his perfect right of self-defense would be forfeited. The bare fact that he went there for the purpose of provoking the difficulty would not per se forfeit his right of self-defense; but under all the authorities, it is immaterial as to what was the intent of defendant in going to the place where the difficulty occurs: he must do some act after arriving there calculated to provoke the difficulty. It follows, therefore, that this charge restricts appellant's right of self-defense. Under defendant's testimony he was clearly entitled to have such phase of the law submitted to the jury. For a discussion of these questions see Hall v. State, 60 S. W. Rep., 769; 66 S. W. Rep., 783; Tollett v. State, 55 S. W. Rep., 573.

Appellant also insists that the court erred in failing to charge on the law of manslaughter. We do not think the evidence in this case raised the issue. If the State's evidence, as contained in this record, be true, appellant was guilty of either murder in the first or second degree. If the defendant's testimony be true he was entitled to a straight charge

on self-defense. There is nothing in his testimony nor in this record authorizing the court to charge on manslaughter.

For the errors discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*